IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **99-cv-00555-JLK**

**ENGINEERED DATA PRODUCTS, INC., a Delaware corporation,**

     Plaintiff,

v.

**GBS CORPORATION, d/b/a GBS FILING SYSTEMS, an Ohio corporation,**

     Defendant.

_____

**MEMORANDUM OPINION ON MOTIONS
FOR PARTIAL SUMMARY JUDGEMENT**
_____

Kane, J.

     The parties in this patent infringement action have filed cross motions for partial

summary judgment on Defendant's intervening rights defense.  This statutory defense

provides that when a patent has been reexamined by the United States Patent and

Trademark Office, a patentee has a right to damages for infringement occurring before the

issuance of the reexamination certificate only if the allegedly infringed claims are

"substantially identical" in the reexamined and original patents.  Defendant contends the

undisputed facts establish that the infringed claims of Plaintiff's patent, as amended

during the reexamination proceeding, are not substantially identical to the corresponding

claims in the original patent and that they are therefore entitled to summary judgment on

their intervening rights defense to damages caused by their alleged infringement before

issuance of the reexamination certificate.  Plaintiff counters that the original and

reexamined claims are substantially identical and intervening rights are not, therefore, available to an alleged infringer.  I grant each party's motion in part and deny it in part as stated below.

## Background

The following facts are undisputed:

The United States Patent and Trademark Office ("PTO") issued U.S. Patent 4,939,674 (the "'674 patent") to Plaintiff Engineered Data Products ("EDP") on July 3, 1990.  The patent, which contained 63 claims when issued, discloses an apparatus that enables a user to define and generate a series of labels, with each label in the series individually identified by unique indicia printed on it.  *See* GBS's Mot. for Partial Summ. J. (Doc. 118), Ex. A [hereinafter "Original '674 Patent'"], col. 1, lines 6-9, 51-56.

In 1999, EDP filed suit against several competitors, including this suit against Defendant GBS Corp. ("GBS"), alleging infringement of the '674 patent.  In response, a defendant in one of these suits requested that the PTO reexamine the '674 patent.  The PTO granted this request in August, 1999, upon finding that a substantial new question of patentability affecting all of the '674 patent's claims was raised by prior art not considered during the patent's original prosecution.  This action was stayed pending the outcome of the reexamination proceeding.

On June 25, 2001, after considering filings by EDP and the party requesting reexamination, the PTO rejected all 63 claims of the '674 patent as being unpatentable over prior art.  GBS's Mot. for Partial Summ. J. (Doc. 118), Ex. C.  EDP responded by

cancelling 15 of the original claims (claims 17, 22, 24-28, 41-48) and amending claims 18-21, 23, 29, 35, 49, 54-58, 62 and 63 in an effort to render all remaining claims in the '674 patent allowable over the cited prior art. *See id.*, Ex. D.

In a July 25, 2002 Office Action, the PTO Examiner rejected the amended claims, as well as the unaltered claims 1-16, as unpatentable over prior art. *See id.*, Ex. E. The basis for rejecting most of these claims was that it would have been obvious to a person having ordinary skill in the art at the time the invention was made to have modified an existing monochromatic label printer, described in the Markem Corp. Brochure, by the teaching of the Young Patent (U.S. Patent 4,889,982), which discloses a process for color coding indicia and inserting the color coding into indica for each label in a series of labels, so that color-coded labels could be produced. *See, e.g.*, *id.*, pp. 4-6.

On August 12, 2002, EDP submitted a response to the July 25, 2002 Office Action in which it argued that the Young Patent did not, in fact, disclose a means for color coding or inserting color coded indicia into a label, and that neither the Markem Corp. Brochure nor Young disclosed a means for automatically generating and printing color-coded labels. GBS's Mot. for Partial Summ. J. (Doc. 118), Ex. F, pp. 4-6. In contrast, EDP argued, its invention, as set forth in original Claim 1 and related claims, automatically produced a series of color coded labels defined by the user. *Id.* (discussing original Claim 1). Other claims, EDP asserted, were distinguishable from the cited prior art because they more broadly encompassed other types of overlaying sets of indicia. *Id.*, pp. 6, 10. EDP also argued in this response that the Young Patent could not be

combined with the Markem Corp. Brochure in the manner suggested by the examiner because the Young Patent did not teach a solution to the problem addressed by EDP's invention, which it described as "automated printing of a series of color-coded labels, each having indicia individual to that label." *Id.*, p. 7.

Following its August 12 response, EDP's counsel participated in several telephone interviews with the examiner. In these interviews, the examiner suggested that "emphasizing the process of color printing in the claims could make the difference between the prior art of record and the claimed invention." GBS's Mot. for Partial Summ. J. (Doc. 118), Ex. H (PTO's Statement of Reasons for Patentability), p. 2; *see* EDP's Opp'n to GBS's Mot. for Partial Summ. J. (Doc. 123), Ex. 5 (Interview Summary dated Dec. 26, 2002), p. 381. The examiner also informed EDP counsel "that an amendment to explicitly point out that color coded labels were being printed in at least claims 1 and 9 was required." GBS's Mot. for Partial Summ. J., Ex. G, p. 7.

EDP responded on January 29, 2003 by submitting additional amendments to claims 1, 9, 20, 29, 49, 58, 62 and 63. *See id.*, Ex. G. With respect Claims 1 and 9, the key "color claims," EDP added language to the last paragraph of the claims specifying "that each of said individually identified labels includes color printing on said label media within one or more of said indicia fields according to the predefined color to indicia correspondence." *See id.*, pp. 1-2. In addition, EDP added language requiring color printing on the labels to claims 20, 58, 62 and 63. *See id.*, pp. 4-6. EDP also added language to Claims 29 and 49, sometimes referred to as the "overlay claims," specifying

that the apparatus included a means for generating a "coded version" of indicia on each label. *See id.*, pp. 4-5.  EDP maintained in its accompanying remarks that all of these amendments merely clarified and made explicit what was inherent in each of the claims as originally patented. *See id.*, p. 7.

On May 1, 2003, the PTO issued a notice of intent to issue a reexamination certificate confirming that the remaining claims of '674 patent, as amended during the reexamination process, were patentable over the prior art of record. *See* GBS's Mot. for Partial Summ. J., Ex. H.  In the accompanying Statement of Reasons for Patentability and/or Confirmation, the PTO reported that it had considered but not been persuaded by EDP's August 12, 2002 arguments that the original claims were patentable over the combination of the cited prior art. *Id.*, p. 2.  It further reported that each of the independent claims of the '674 patent (claims 1, 9, 20, 29, 49, 58, 62 and 63), as amended by EDP in January, 2003, was now distinguishable over these references. *Id.*

On August 19, 2003, the PTO issued a Reexamination Certificate for the '674 patent which, consistent with its notice of intent, announced that claims 17, 22, 24-28 and 41-48 of the original '674 patent were cancelled, that claims 1, 9, 14-16, 18-21, 23, 29, 35, 49, 54-58, 62 and 63 were determined to be patentable as amended and that claims 2-8, 10-13, 30-34, 36-40, 50-53 and 59-61, each of which is dependent on an amended claim, were also determined to be patentable. *Id.*, Ex. I, p. 3.

After the stay in this action was lifted, the parties filed the cross motions for summary judgment on GBS's intervening rights defense that are the subject of this decision.

## Legal Standards

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The parties agree there are no issues of fact material to the determination of GBS's intervening rights defense. *See* GBS's Mot. for Partial Summ. J. (Doc. 118) at 2; EDP's Cross Mot. for Partial Summ. J. (Doc. 123) at 1.

The purpose of reexamination is to permit a patentee or other interested person to obtain review and, if necessary, correction of the claims that resulted from initial examination of the patent. *Bloom Eng'g Co. v. North Am. Mfg. Co.*, 129 F.3d 1247, 1249 (Fed. Cir. 1997). The effect of a reexamined patent during the period before issuance of the reexamination certificate is governed by 35 U.S.C. § 252 and § 307(b), which together provide that to the extent that the reexamined claims are "substantially identical" to the original claims, the reexamined claims constitute a continuation of the original patent. *See* 35 U.S.C. §§ 252, 307(b). A patentee of a reexamined patent is, therefore, entitled to recover infringement damages for the period between the date of issuance of the original patent and the date of issuance of the reexamined claims if the original and reexamined claims are "substantially identical." *See* 35 U.S.C. §§ 252, 307(b); *Laitram*

-6-

*Corp. v. NEC Corp. ("Laitram IV")*, 163 F.3d 1342, 1346 (Fed. Cir. 1998).[1]  If the

claims are not substantially identical, then the statutes relieve those who may have

infringed the original claims from liability during the period before the claims were

reexamined.  *See* 35 U.S.C. §§ 252, 307(b); *Bloom*, 129 F.3d at 1249.  This is the defense

of intervening rights.

Reexamined claims are "substantially identical" to their original counterparts if

they are without substantive change.  *Laitram IV*, 163 F.3d at 1346.  The use of different

words is immaterial so long as the scope of the claims are identical.  *See id.*  An

amendment that clarifies the text of a claim "to make specific what was always implicit or

inherent," or that "makes it more definite without affecting its scope" is not a substantive

change under this test.  *Laitram Corp. v. NEC Corp. ("Laitram I")*, 952 F.2d 1357, 1361

(Fed. Cir. 1991); *Bloom*, 129 F.3d at 1250; *see Kaufman Co. v. Lantech, Inc.*,

807 F.2d 970, 977 (Fed. Cir. 1986).  Whether patent claims have been substantively

---

[1]     At the time of *Laitram IV* and the other decisions cited herein regarding the intervening rights defense, § 252 provided that intervening rights applied unless the original and reexamined or reissued claims were "identical."  The Federal Circuit did not construe this term to mean strictly identical, however, but rather that the claim in question had not been substantively changed.  *See, e.g.*, *Laitram IV*, 163 F.3d at 1346; *Bloom*, 129 F.3d at 1250; *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1115-16 (Fed. Cir. 1987) (citing authority barring intervening rights when claims are "substantially identical").  In 1999, Congress apparently approved this construction by amending § 252 to change "identical" to "substantially identical."  *See* H.R. Rep. 105-39, at 62, 1997 WL 136374 (Leg. Hist.)] (stating that courts have interpreted "identical" as used in § 252 to mean "substantially identical," citing *Slimfold*, 810 F.2d 1113).  Accordingly, the authority cited herein regarding "identical" under the pre-1999 version of § 252 is equally applicable to construing the term "substantially identical" as used in the current version of the statute.

changed in the course of reexamination is a question of law decided by the Court.

*Westvaco Corp. v. International Paper Co.*, 991 F.2d 735, 741 (Fed. Cir. 1993).

"To determine whether a claim change is substantive, it is necessary to analyze the claims of the original and reexamined patents in light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information." *Laitram IV*, 163 F.3d at 1347 (quoting *Laitram I*, 952 F.2d at 1362-63).  In analyzing the original and reexamined claims, the words of the claims "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).  In determining this meaning, I must consider the specification, but may not import limitations from it into the claims.  *Id.* at 1315, 1319-20; *Laitram IV*, 163 F.3d at 1347.  I may also consider extrinsic evidence, such as dictionary definitions, in construing the original and reexamined claims, so long as I consider the extrinsic evidence in the context of the claims, specification and prosecution history and the extrinsic evidence does not contradict any definition found in or ascertained from this intrinsic evidence.  *See Phillips*, 415 F.3d at 1319, 1322-23.

## Discussion

## I.   Preliminary Issues

Before determining whether the claims of the '674 patent were substantively changed in the reexamination proceeding, I will address two arguments by EDP that

would obviate the need for this examination if accepted.  First, EDP asserts that the

defense of intervening rights only applies when the original claims have been broadened

on reexamination.  Because GBS alleges that the claims of the '674 patent were narrowed

during examination, EDP argues that even if its patent claims were substantively changed

in this manner, GBS's intervening rights defense fails as a matter of law.

I find no merit in this argument.  Section 305, which governs reexamination

proceedings, prohibits an applicant from broadening a claim during reexamination.  *See*

35 U.S.C. § 305; *Creo Products, Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1343 (Fed. Cir.

2002).  Section 307(b), meanwhile, expressly provides for the application of § 252's

intervening rights defense to reexamined claims, which would be unnecessary if EDP

were correct that intervening rights only apply to broadened claims.  In addition, the

Federal Circuit has routinely applied the intervening rights defense to narrowing

amendments.  *See, e.g.*, *Laitram IV*, 163 F.3d at 1349; *Bloom*, 129 F.3d at 1251; *see also*

*In re Etter*, 756 F.2d 852, 862 (Fed. Cir. 1985) (Nies, J., concurring) (patent owner, "may

amend his claims in reexamination and secure narrower new claims.  Upon amendment,

his claims are subject to complete examination and an infringer has the benefit of

intervening rights to the extent afforded under 35 U.S.C. § 252 pursuant to 35 U.S.C.

§ 307(b).").  The cases on which EDP rely, consisting of four district court decisions, are

not persuasive in light of this authority.

EDP also argues GBS's intervening rights defense fails as a matter of law because

GBS has failed to present evidence that it relied on the scope of the original claims.  This

argument confuses the separate defenses of absolute intervening rights and equitable

intervening rights, only the latter of which might require proof of reliance.

Absolute intervening rights, created by the first sentence of the second paragraph

of § 252, "provide an accused infringer with the absolute right to use or sell a product that

was made, used, or purchased *before* the grant of the reissue patent [or issuance of the

reexamination certificate] as long as this activity does not infringe a claim of the reissue

[or reexamined] patent that was in the original patent." *BIC Leisure Products, Inc. v.*

*Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1220-21 (Fed. Cir. 1993) (emphasis added); *see*

*Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1359-60 (Fed. Cir. 2001).  In contrast, equitable

intervening rights, created by the second sentence of this paragraph, allow a court to

permit an accused infringer to continue the manufacture, use or sale of additional articles

covered by the reissued or reexamined patent *after* reissuance or reexamination "as the

court deems equitable for the protection of investments made or business commenced

before the grant of the reissue."  35 U.S.C. § 252; *see Shockley*, 248 F.3d at 1361; *BIC*,

1 F.3d at 1221.

GBS's motion for partial summary judgment on enforcement of the '674 patent

before issuance of its Reexamination Certificate is based on absolute intervening rights.

*See* GBS's Reply to EDP's Br. in Opp'n (Doc. 126) at 3 & n.2.  EDP's sole authority for

imposing a reliance requirement on GBS, the Federal Circuit's dicta twenty years ago in

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1117 (Fed. Cir. 1987), cannot

be read to impose this requirement in light of the statutory language and subsequent

precedent defining "absolute" intervening rights and applying these rights to articles already made at the time the reexamination certificate was issued.[2]  *See, e.g.*, *BIC*, 1 F.3d at 1221.  Accordingly, EDP is not entitled to summary judgment on GBS's intervening rights defense on this basis.

## II.    Analysis of Original and Reexamined Claims

GBS contends all of the claims set forth in the '674 patent were substantively changed as a result of amendments made during reexamination.  EDP concedes that the amendments to Claims 58-63 were substantive because they narrowed the scope of these claims,[3] but assert that the scope of the remaining claims was unchanged by the reexamination amendments.  The remaining claims fall into two categories: (1) claims that both in their original and reexamined form refer to "color" directly and/or by reference to an independent claim that includes this language; and (2) claims that address the overlay of indicia on the printed labels.

---

[2]    In addition, if reliance was required to assert absolute intervening rights, GBS has submitted proof of its reliance on the scope of the original claims of the '674 patent.  *See* GBS's Surreply to EDP's Reply (Doc. 133), Ex. A (Aff. of Pat Lieser).

[3]    Claims 58, 62 and 63 were amended during reexamination to require the production and printing of color coded indicia on each label.  Before amendment, these claims did not reference color coded indicia or contain any color-related limitations.  Claims 59-61 are dependent on Claim 58 and thus were also substantively changed as a result of the narrowed scope of that claim.

## A.    Color claims

The color claims in the '674 patent consist of independent Claims 1, 9 and 20 and

dependent claims 2-8, 10-16, 18-19, 21 and 23.  The parties agree that the determinative

question with respect to these claims is whether the original claims required the printing

of color on the individual labels generated by the apparatus or whether this limitation was

added by the reexamination amendments.  If, as GBS contends, this limitation was not

inherent in the original color claims of the '674 patent, then it has intervening rights with

respect to its alleged infringement of these claims before the Reexamination Certificate

issued.

The question of whether the scope of the color claims was substantively changed

begins with a review of the original claim language and the amendments made during

reexamination.  Claim 1 reads as follows, with reexamination amendments shown as **bold

for additions** and ~~strikeout for deletions~~:

> 1.  Apparatus for automatically producing a series of labels, each
> label in said series of labels containing a set of indicia individual to
> said label and ordered according to a user defined ordering,
> comprising:
>
> means for defining a label template having one or more writable
> indicia fields;
>
> means for automatically generating a set of indicia for each of said
> labels in said series of labels, wherein each successive set of indicia
> in said series of labels is ordered according to a user defined
> ordering;

means for color coding at least one of said indicia according to a predefined color to indicia correspondence;

means for inserting each of said sets of indicia, individual to each label in said series of labels, and said color coding into said one or more indicia fields for each label in said series of labels; and

means for automatically printing each of said individually identified labels in said series of labels on to label media, **so that each of said individually identified labels includes color printing on said label media within one or more of said indicia fields according to the predefined color to indicia correspondence.**

GBS's Mot. for Partial Summ. J., Ex. I [hereinafter "Reexamination Certificate"],

col. 1, lines 24-46.

Claim 9 reads similarly to Claim 1 before and after amendment:

9.  A method of automatically producing a series of labels, each label containing indicia individual to said label, comprising the steps of:

defining a label template having one or more writable indicia fields;

automatically generating indicia, individual to each label in said series of labels, according to the user defined ordering;

color coding at least one of said indicia according to a predefined color to indicia correspondence;

inserting said generated indicia, individual to each label in said series of labels, and said color coding into said one or more indicia fields for each label in said series of labels; and

automatically printing each of said individually identified labels in said series of labels on to label media, **so that each of said individually identified labels includes color printing on said label media within one or more of said indicia fields according to the predefined color to indicia correspondence**.

Reexamination Certificate, col. 1, lines 47-67.

Finally, Claim 20, after amendment, consists of a combination of the complete text of original Claim 17, *shown in italics,* and original Claim 20, shown in plain text,  with one deletion, shown in ~~strikeout~~, and one addition, shown in **bold** below:

> 20. ~~The apparatus of claim 17~~ *Apparatus for automatically producing a series of labels, each label containing indicia individual to said label, comprising:*
>
> *means for defining a label template containing one or more writable indicia fields;*
>
> *means for automatically generating indicia for each of said indicia fields on each of said labels in said series according to a user defined label identification ordering to individually identify each label,* wherein said generating means produces color coded indicia;
>
> *means for combining said template and said generated indicia to produce a definition of a series of individually identified labels; and*
>
> *means for automatically printing said defined series of labels on label media* **so that printing said labels includes printing the color coded indicia**.

Reexamination Certificate, col. 2, lines 18-34, *compared with* GBS's Mot. for Partial Summ. J., Ex. A [hereinafter "Original '674 Patent"], col. 16, lines 45-58, 63-64.

The amendments to Claims 1, 9 and 20 during reexamination added language to the last element of each claim that explicitly requires that the printed labels produced by the apparatus include color coded indicia.  Based on the plain

-14-

language of the original claims, however, I find this limitation was already included. Original Claim 1, for example, describes an "[a]pparatus for automatically producing a series of labels, each label in said series containing a set of indicia individual to each label," including a "means for *color coding at least one of said indicia* according to a predefined color to indicia correspondence," a "means for *inserting* each of said sets of indicia . . . *and said color coding* into said one or indicia fields for each label," and a "means for automatically *printing each of said individually identified labels* . . . on to label media." Original '674 Patent, col. 15, lines 19-21, 29-35, 37-39 (emphasis added). This language, by requiring the insertion of color coded indicia on each label in the series and the automatic printing of each label, necessarily requires the printing of color on each label according to the predefined color to indicia correspondence, *i.e.*, the automatic printing of labels that included color coded indicia.

The language of original Claim 9, setting out the steps of "automatically generating indicia" for each individual label, "color coding at least one of said indicia," "inserting said generated indicia . . . and said color coding" on each label and then "automatically printing" each label, similarly requires the printing of color coded indicia on each label. The combination of original Claims 17 and 20, now set out in amended Claim 20, does the same. Examination of the original and amended claim language, therefore, indicates that the amendments to the color

claims during reexamination only made explicit or highlighted what was already inherent in these claims.

GBS disputes this conclusion, but does so by focusing solely on the final paragraph of the original independent color claims, which did not specifically state that color coded labels were to be printed. This paragraph, however, required the printing of each "individually identified label" as defined and specified in the preceding paragraphs or elements of the claim. These preceding paragraphs, as described above, required the generation of individually identified labels that included color coding. It is a basic canon of claim construction that"[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). As a result, the claim must be read as a whole, *see Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000); *General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992), and cannot be parsed as GBS urges. Considered as a whole, the original independent color claims each required the printing of individually identified labels that are color coded.

The specification of the '674 patent supports the conclusion that the original color claims required the printing of the individually identified labels generated by the process they described. The specification repeatedly emphasizes

the printing of indicia onto each individually identified label.  *See, e.g.*, Original

'674 Patent, col. 2, lines 1-3 ("The user specifies the type of indicia or

combinations of the above listed indicia that are to be printed on the individual

labels"), col. 2, lines 21-26 (indicia data is "combined with the template . . . to

create a set of information that defines each label" and is "used . . . to drive a

printing mechanism to transfer the defined individually identified labels onto a

label media"), col. 7, lines 34-36 ("indicia that are used to individually identify all

of the labels . . . that are to be printed").  "[I]ndicia" are defined as "any sort of

identification that *can be printed on the label*," including "alphanumeric

characters, bar codes, [and] *color*," *id.*, col. 7, lines 9-13 (emphasis added).  The

specification also describes "the use of *color coded indicia that are written into

each of the writable indicia fields*," *id.*, col. 7, lines 22-26 (emphasis added), as

well as printed labels that are coded with a background color and corresponding

data characters, *see id.*, col. 9, lines 28-31, 38-68.

In contrast to the plain language of the original color claims, the

specification does not limit the labels produced by the invention only to those

containing color or color coded indicia.  This circumstance does not, however,

change my conclusion that the original claims were so limited.  Just as it is

improper to read limitations from the specification into a claim, so too it is

improper to read an express limitation out of a claim based on the specification.

"Specifications teach.  Claims claim."  *Oak Technology, Inc. v. U.S. Int'l Trade Comm'n*, 248 F.3d 1316, 1329 (Fed. Cir. 2001).  "While claims are to be interpreted in light of the specification, all that appears in the specification is not necessarily with the scope of the claims."  *Novo Nordisk of North Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1369 (Fed. Cir. 1996); *see Laitram IV*, 163 F.3d at 1347 ("if everything in the specification were required to be read into the claims . . . there would be no need for the claims" (quotation omitted)).  When an applicant has filed narrow claims, these claims cannot be broadened based on a broader disclosure in the specification.  *See Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1359 (Fed. Cir. 2006) ("where a patent specification includes a description lacking a feature, but the claim recites that feature, the language of the claim controls"); *Oak Technology*, 248 F.3d at 1329 (specification's disclosure of embodiment not covered by claim language does not broaden claim); *Novo Nordisk*, 77 F.3d at 1370 n.8 (noting patentee wrote a broader disclosure than what it claimed).  Here, the plain language of EDP's original color claims limited the claimed invention to an apparatus producing color coded labels.  While the specification is more broadly written, the narrower language of the original color claims defines and limits the scope of these claims.

The prosecution history for the original claims also supports my finding that the original claims required the printing of color and color coded indicia on each

label.  The original application did not include this limitation.  The examiner

rejected the original application over prior art, prompting the applicants to submit

a Request for Reconsideration in which they disputed the examiner's basis for

rejection and added the color coding provision to Claims 1 and 9 in order "to

further distinguish" the invention from the Ward patent, the prior art cited by the

examiner.  *See* EDP's Opp'n to GBS's Mot. for Partial Summ. J., Ex. 4 (excerpts

from original prosecution history) at 112-17.  In describing this limitation, the

applicants stated that "this *color coding* is inserted into the label template and

*printed as part of the label*.  The Ward patent does not show or suggest any

apparatus that can produce color coded labels.  The Ward apparatus can simply

print labels in black ink on standard label media.  This apparatus does not have the

capability to assign colors to specific indicia such that the *color is printed on the*

*label . . ..*"  *Id.* at 116 (emphasis added).  In response, the examiner allowed the

claims.  *Id.* at 134.  While the examiner did not state his reasons for allowance, the

allowance of these claims following the described amendment distinguishing the

Ward patent at minimum is consistent with the conclusion that the original claims

required the printing of color coded labels.

The chief evidence cited by GBS in support of its contention that the scope

of the original claims was substantively changed during reexamination is the

prosecution history on reexamination.  There is no dispute that the addition of

language to the last clause of the independent color claims specifying that "each [label] includes color printing . . . according to the predefined color to indicia correspondence" resulted in the allowance of the color claims after their rejection over prior art in the reexamination proceeding.  The Federal Circuit has observed that "this is a highly influential piece of evidence" and that "it is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment." *Laitram IV*, 163 F.3d at 1348.  The Federal Circuit has also emphasized, however, that this is not a *per se* rule, and that the determination of whether amended claims were substantively changed must be based on an overall examination of the language of the respective claims, the written description and the prosecution history. *Id.*

I find this is a situation in which the allowance of a rejected claim after amendment did not substantively change the scope of the claim.  This conclusion rests not only on the plain language, specification and prosecution history of the original color claims as described above, but also on the examiner's Statement of Reasons for Patentability and/or Confirmation of the amended color claims.  In the Statement, the examiner reported that these claims were amended "to highlight" the process of color printing following his suggestion that "emphasizing" this process could overcome the prior art of record.  GBS's Mot. for Partial Summ. J.,

Ex. H at 5.  One cannot emphasize or highlight a limitation that was not present in the first instance.  Accordingly, the examiner's statement in allowing the amended color claims supports the conclusion that the original claims contained this limitation, and that the amendments merely clarified or made this limitation explicit.[4]

For the reasons stated above, I find the amendments during reexamination to independent claims 1, 9 and 20 and their dependent claims did not substantively change these claims.  The original and reexamined color claims, therefore, are substantially identical, with the result that the defense of intervening rights is not available to GBS with respect to its alleged infringement of these claims.

## B.    Overlay claims

The overlay claims in the '674 patent consist of independent Claims 29 and 49 and dependent Claims 30-40 and 50-57.  Claim 29 was originally dependent on

---

[4]    In initially rejecting the original color claims on reexamination, the examiner also stated that it would have been obvious to a person having ordinary skill at the time of the invention to modify the Markem Corp. Brochure, a label printer, in view of the Young Patent, which disclosed color coded labels, to produce an automatic color label generator that included color coding of at least one indicia according to a predefined color to indicia correspondence.  *See* GBS's Mot. for Partial Summ. J., Ex. D (Apr. 17, 2002 Office Action) at 5-6.  In order for this combination of prior art to render the original color claims obvious, the examiner must have also read these claims as providing for the automatic generation of color coded labels.  EDP's August 12, 2002 response to the examiner's obviousness analysis further demonstrates this point.  This portion of the reexamination history, therefore, also supports the conclusion that the amendments on reexamination merely emphasized a limitation that was already present in the original color claims.

Claim 22 which itself is dependent on original Claim 17.  Original Claim 49 was

also dependent on original Claim 17.  During reexamination, both Claims 29 and

49 were rewritten in independent form to repeat all the limitations of their

antecedent claims and to delete and add certain language.

Amended Claim 29 is set out below, with text from original Claim 17

shown in *italics*, text from original Claim 22 shown in <u>*underlined italics*</u>, text from

original Claim 29 shown in normal text, and new language shown in **bold** and

deletions shown in ~~strikeout~~.

> 29.  ~~The apparatus of claim 22 wherein said combining means includes~~  *Apparatus for automatically producing a series of labels, each label containing indicia individual to said label, comprising:*
>
> *means for defining a label template containing one or more writable indicia fields;*
>
> *means for automatically generating indicia for each of said indicia fields on each of said labels in said series according to a user defined label identification ordering to individually identify each label,* **comprising:**
>
> <u>*means for generating first and second sets of indicia, said second set of indicia being a*</u> ~~replication~~ **coded version** <u>*of said first set of indicia but in a different indicia form*</u>;
>
> *means for combining said template and said generated indicia to produce a definition of series of individually identified labels,* **comprising:**
>
> means for overlaying said first and said second sets of indicia, *and*

> *means for automatically printing said defined series of labels on label media* **so that printing said labels includes printing the overlaid first and second sets of indicia.**

Reexamination Certificate, col. 2, lines 41-62, *compared with* Original '674 Patent, col. 16, lines 45-58, 67-68, col. 17, lines 1-6, 24-27.

Using the same indicators of origin, the text of amended Claim 49 is:

> 49.  ~~The apparatus of claim 17 wherein said generating means includes~~ *Apparatus for automatically producing a series of labels, each label containing indicia individual to said label, comprising:*
>
> *means for defining a label template containing one or more writable indicia fields;*
>
> *means for automatically generating indicia for each of said indicia fields on each of said labels in said series according to a user defined label identification ordering to individually identify each label,* **comprising:**
>
> means for generating a plurality of sets of indicia, each of said sets of indicia being a ~~replication~~ **coded version** of the other ones of said sets of indicia but in a different indicia form, for said indicia fields on each of said labels in said series of labels in said series according to said label identification ordering to individually identify each label:
>
> *means for combining said template and said generated indicia to produce a definition of series of individually identified labels,* **comprising:**
>
> **means for overlaying at least two of said sets of indicia; and**
>
> *means for automatically printing said defined series of labels on label media so that printing said labels includes printing the overlaid sets of indicia.*

Reexamination Certificate, col. 3, lines 4-28, *compared with* Original '674 Patent, col. 16, lines 45-58, col. 18, lines 17-25.

The key change in both of these claims during reexamination was requiring that "said second set of indicia be[] a *coded version* of said first set of indicia but in a different indicia form," as opposed to a "replication" of the first set of indicia. Amended Claim 29 (emphasis added); *see* Amended Claim 49.[5]  EDP argues that this change was not substantive because the ordinary meaning of the original claim language, a "replication" of a set of indicia "in a different indicia form," is the same as a "coded version" of the indicia.  EDP contends this is so because the ordinary meaning of "coded" is something converted into a different form.  The only evidence it cites in support of this contention is the definition for the verb "to code" in the 1982 edition of the American Heritage Dictionary, which states it means "to convert (a message, for example) into a code."

This definition is not of assistance because it does not define the included, and determinative, term "code."  Dictionaries, including that cited by EDP, define "code" as "a system . . . in which arbitrarily chosen words, letters, or symbols *are assigned definite meanings*."  Random House Unabridged Dictionary 397 (2[d] ed. 1993) (emphasis added); Amer. Heritage Dictionary 287 (2[d] College ed. 1982) ("a

---

[5]         GBS also argued in its opening brief that Claims 29 and 49 were substantively changed because the amendments on reexamination required an additional element, a means for overlaying the indicia.  *See* GBS's Mot. for Partial Summ. J. at 10. GBS did not pursue this argument after EDP rightly pointed out that this limitation was present in the original, antecedent claims to reexamined Claims 29 and 49.  The addition of the phrase "so that printing said labels includes printing the overlaid . . . sets of indicia" to the last paragraph of these claims also did nothing more than emphasize an element that was inherent in the original claims.

system of symbols, letters, or words given certain arbitrary meanings"); Webster's

Third New Int'l Dictionary 437 (1976) ("a system in which arbitrary meanings are

assigned to letters, numbers, words, or other symbols").  The concept included in

"code" or "coded" that is missing from the original claim's use of the term

"replication" is that the second set of indicia has an "assigned definite meaning"

relative to the first set of indicia.  Accordingly, the ordinary meaning of the second

set of indicia being a "coded version" of the first set of indicia is substantively

different from the second set of indicia being a "replication" of the first.

The history of Claims 29 and 49 on reexamination supports this conclusion.

In his Statement of Reasons for Patentability and/or Confirmation following

amendment of original Claims 29 and 49, the examiner stated that the amended

claims overcame the prior art that had previously resulted in rejection of these

claims because:

> the prior art of record fails to teach (in combination with other features in
> the claim) an apparatus or method for automatically producing a series of
> labels wherein each of the individual labels includes overlaying a first and
> second sets of indicia, wherein the second set of indicia is a coded version
> of the first set of indica but in a different indicia form, wherein the indicia
> form is represented by color coding,[6] wherein the first indicia is [a] coded
> version of the second indicia as described on col. 7, lines 14-31 and col. 13,
> lines 14-52 of Applicant's disclosure.

---

[6]      Although the examiner referred to color coding in distinguishing
reexamined Claims 29 and 49 from the prior art, neither the original nor amended
versions of these claims included this limitation.

GBS's Mot. for Partial Summ. J., Ex. H at 5.  The examiner's allowance of the amended claims following his rejection of the original claims in light of prior art is a significant piece of prosecution history, *see Laitram IV*, 163 F.3d at 1348, that supports my conclusion that overlay claim language and hence the scope of the claims changed substantively during reexamination.

The specification, including the sections to which the examiner referred in allowing amended Claims 29 and 49, also supports this conclusion.  These sections do not define "coded" but instead discuss "redundant indicia."  Original '674 Patent, col. 7, lines 14-31.  The specification identifies the use of "bar coding" and "color coded indicia" as "examples" of such "duplicate or redundant indicia," but does not limit the term to these meanings.  *See id.*, col. 7, lines 19-28. Accordingly, assuming "duplicate or redundant indicia" is the equivalent of "replication" of the first indicia in a different form as stated in original Claims 29 and 49, the specification does not support EDP's argument that the original overlay claims included the limitation of "coded versions" as specified in the amended claims.[7]

For the reasons stated above, I find that the scope of overlay Claims 29 and 49 and their dependent claims was substantively changed during reexamination.

---

[7]      In addition, even if the specification could be read to include this limitation, importing it into the original claims would be contrary to the Federal Circuit's standards for claim construction.  *See, e.g.*, *Phillips*, 415 F.3d at 1323; *Laitram IV*, 163 F.3d at 1347.

Because the claims are not substantially identical, the doctrine of intervening rights bars recovery of damages for their alleged infringement before issuance of the Reexamination Certificate.

Conclusion

Based on the analysis above, I grant in part and deny in part the parties' cross motions for summary judgment concerning GBS's intervening rights defense.

I grant GBS's motion (Doc. 118) and deny EDP's cross motion (Doc. 122) with respect to Claims 58-63 and the overlay claims, Claims 29, 49 and dependent Claims 30-40 and 50-57, based on my finding that the scope of these claims was substantively changed by amendment during reexamination.  Accordingly, under the doctrine of absolute intervening rights, GBS is entitled to partial summary judgment on EDP's claim for damages for alleged infringement of these claims before issuance of the  Reexamination Certificate for the '674 patent on August 19, 2003.

With respect to the color claims, independent Claims 1, 9 and 20 and dependent Claims 2-8, 10-16, 18-19, 21 and 23, I deny GBS's motion and grant EDP's cross motion.  Because the amendment of these claims during reexamination did not change their scope, GBS may not assert the defense of

absolute intervening rights to avoid damages for its alleged infringement of these claims before issuance of the Reexamination Certificate.

IT IS SO ORDERED.

Dated this 23rd day of March, 2007.

s/ John L. Kane                              
John L. Kane, Senior District Judge
United States District Court